IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 08–cv–01421–EWN–


KATHLEEN P. SCHMIDT,

     Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

     Defendant.

---

## ORDER AND MEMORANDUM OF DECISION

---

     This is a social security benefits appeal.  Plaintiff Kathleen P. Schmidt challenges the

final decision of the Commissioner of Social Security (the "Commissioner") denying her

application for social security disability benefits.  Jurisdiction is premised upon 42 U.S.C. §

405(g).

## FACTS

### 1.     *Medical Evidence*

     Plaintiff was born in Chicago, Illinois, on January 1, 1954.  (Admin. R. at 49 [filed Sept.

17, 2007].)  Plaintiff is certified as an Emergency Medical Technician ("EMT") and has a

college degree in physical education.  (*Id*. at 261, 266, 308–09.)  She has worked in the

vocationally relevant past as a fast food manager and a retail manager.  (*Id*. at 61, 69.)  Plaintiff

claims that an injury to her right knee, and continuing problems associated with it, resulted in her becoming disabled on November 1, 2002.[1]  (*Id.* at 305.)

On April 24, 2001, Plaintiff visited Dr. Hector Brignoni with Arbor Medical Services, an occupational health practice, complaining of pain in her right ankle.  (*Id.* at 260.)  On March 20, 2001, according to Plaintiff's report, she twisted and injured her ankle while working at a McDonald's fast food restaurant.  (*Id.*)  Dr. Brignoni diagnosed the injury as a sprain and recommended physical therapy, medication, modified working conditions, and further review. (*Id.* at 232, 260.)  On May 22, 2001, after Plaintiff showed little improvement, she was referred to and seen by Dr. Robert FitzGibbons, an orthopedist, who prescribed additional tests and detected a potential stress fracture and another defect in her ankle.  (*Id.* at 232.)  Plaintiff was fitted with a walking cast boot to assist in her ankle rehabilitation.  (*Id.*)  While in the boot, Plaintiff's ankle apparently healed, but she soon reported a pain in her right knee.  (*See id.* at 231–32, 253.)

On July 18, 2001, Plaintiff first reported the pain in her right knee during an office visit to Arbor Medical Services.  (*See id.* at 232, 253.)  Some of Plaintiff's doctors have speculated that the walking cast boot caused Plaintiff to alter her gait, which in turn led to her knee injury. (*See id.* at 230–33, 253.)  A report by Dr. K. James Schlegel of Arbor Medical Services noted Plaintiff's "[right] knee pain [and] swelling that has been considered caused by altered

---

[1] Plaintiff originally reported the onset date as August 20, 2002.  (*See id.* at 49.)  On February 23, 2006, at the ALJ hearing Plaintiff asked to amend this to show an November 1, 2002, onset date. (*See id.* at 305.)

mechanics from a walking boot on an already diseased knee joint." (Id. at 231.) By "already diseased knee joint," Dr. Schlegel appears to refer to a defect in Plaintiff's right knee that resulted in arthroscopic surgery in 1983. (*See id.* at 147, 206.) There are also occasional references in the record to reports by Plaintiff that she also fell and twisted her knee while wearing the walking cast boot. (*Id.* at 220, 265.)

Plaintiff continued to see Dr. Schlegel, Dr. Peter Mars, and Bill Ford, RN, ANPC at Arbor Medical Services regarding her knee. (*See id.* at 226–30.) Dr. Schelgel also referred her for diagnostic testing. (*Id.* at 191.) The results of this testing showed "mild degenerative disease in [her] right knee." (*Id.* at 192.) On August 17, 2001, Dr. Schlegel restricted Plaintiff to seated work only. (*Id.* at 231.) Between January and March of 2002, Dr. Mars authorized Plaintiff's return to work for half-day shifts, but the level of work fluctuated between regular and modified duty in response to Plaintiff's reported pain. (*See id.* at 226–28.)

On July 24, 2001, Plaintiff returned to Dr. FitzGibbons for examination of her knee. (*Id.* at 232.) Dr. FitzGibbons gave Plaintiff a steroid injection and recommended physical therapy. Dr. Gibbons also referred her for diagnostic imaging. (*Id.* at 188.) On September 11, 2001, Dr. David Goodbee analyzed an image of Plaintiff's right knee and concluded that Plaintiff had "small joint effusion," "grade [two] degenerative changes of the medial meniscus, particularly at the anterior horn, with likely a small tear extending to the superior articular surface," and degenerative changes in both medial and lateral compartments, but more severe in the medial compartment. (*Id.* at 188–89.)

On December 12, 2001, Dr. FitzGibbons performed arthroscopic surgery on Plaintiff's right knee. (*Id.* at 185–86.) Finding mild cartilage damage and a tear in the meniscus, he performed a debridement (removal of material) and partial meniscectomy (removal of meniscus) on Plaintiff's knee. (*Id.* at 185.) Dr. FitzGibbons also noted a grade three chondromalacia (softness of the cartilage) of the weight bearing surface of her femor. (*Id.*)

Following the arthroscopic knee surgery, Plaintiff began physical therapy at the Colorado Center for Rehabilitation. (*See id.* at 175.) By January 3, 2002, three weeks after the surgery, Physical Therapist Candice Goodwin noted that Plaintiff's recovery was progressing and that she displayed only minor gait deviations and minor decreases in strength and range of motion in her right leg. (*See id.* 175.) Over the next month and a half, Plaintiff underwent physical therapy and reported intermittent improvements and setbacks with continued pain and swelling. (*See* 157–74.)

Dr. FitzGibbons also continued to examine Plaintiff following her surgery. He noted that pain, some tenderness, crepitus, and effusion persisted within a month of her surgery, and that there appeared to be derangement of her lateral meniscus and the posterior horn of her medial meniscus. (*See id.* at 215–16.) On March 4, 2002, during the next visit to Dr. FitzGibbons, the doctor noted that Plaintiff was "better than before surgery." (*Id.* at 213.) On April 23, 2002, Plaintiff told Dr. FitzGibbons, "I hurt all the time." (*Id.* at 210.) The doctor noted Plaintiff's report of a persistent pattern of moderate to severe pain over the preceding four months that was aggravated by twisting, squatting, kneeling, and stairs, and expanded his assessment to include possible osteoarthritis. (*Id.* at 210–11.) Dr. FitzGibbons administered a cortisone shot to

Plaintiff's right knee and concluded, "She is basically miserable but it may be pain she will have to live with if [another drug] Synvisc does not help." (*Id.* at 211.)

On August 6, 2002, with her condition reportedly worsening in the intervening time to persistent severe pain, relieved by nothing, and aggravated by any movement, Dr. FitzGibbons administered a shot of Synvisc in Plaintiff's right knee. (*Id.* at 204–06.)   On October 1, 2002, Plaintiff reported some improvements she attributed to the Synvisc injections and the fact that she discontinued working. (*Id.* at 198.)  On November 11, 2002, Plaintiff visited Dr. Fitzgibbons for the last time and reported the pain in her knee as moderate, but still present. (*See id.* at 195.) Plaintiff noted that physical activity aggravated the pain in her knee and rest helped it. (*Id.*)

On November 1, 2002, Plaintiff returned to Arbor Medical Services and reported increased pain over the preceding three weeks. (*See id.* at 224.)  She also reported falling eight times during the previous weekend. (*See id.*)  Dr. Brian Mathwich of Arbor Medical Services reported that Plaintiff's high level of pain interfered with the examination, but that Plaintiff appeared to have significant knee pain. (*See id.*)  On December 6, 2002, upon referral from Dr. Mars of Arbor Medical Services, Plaintiff visited the Colorado Center for Rehabilitation for an Abbreviated Lower Extremity Functional Capacity Evaluation (FCE). (*See id.* at 265.)  The report notes that Plaintiff had a slow, altered gait. (*Id.*)  The test had to be limited because Plaintiff lost her balance and fell during the evaluation of her ambulation. (*Id.* at 268.)  The examiner did remark that Plaintiff had no apparent sitting limitations, but did have restrictions on climbing stairs and standing. (*Id.*)

Soon after the FCE, Dr. Mars discontinued his treatment of Plaintiff. (*See id.* at 221). In his final report, he noted that Plaintiff still reported knee pain, was looking for sedentary work, used a cane to walk, was taking occasional over-the-counter medication for her pain, and was able to perform all of the activities of daily living. (*Id.* at 220.) Dr. Mars noted that Plaintiff's knee was not swollen or tender, was neurovascularly intact, and had full extension. (*Id.*) However, he also noted an altered gait compensating for pain, limits on flexion, and the existence of grade three chondromalacia. (*Id.* at 221.) Dr. Mars also concluded that Plaintiff was at her Maximum Medical Improvement, maintaining a twenty-five percent impairment of her lower extremity which translated into a ten percent impairment of her whole body. (*Id.* at 221.) Finally, Dr. Mars put Plaintiff on permanent work restrictions, permitting only sedentary work and limiting standing or walking to fifteen minutes per hour. (*Id.*) He further limited Plaintiff to no squatting, climbing, or crawling. (*Id.*)

On December 11, 2003, Dr. Sepeidah Nouhi conducted a consultative examination of Plaintiff. (*Id.* at 261.) Dr. Nouhi noted tenderness and mild effusion in Plaintiff's right knee and flexion limited to ninety degrees. (*See id.* at 263.) Dr. Nouhi also noted that Plaintiff was "experiencing daily pain limitation and function." (*Id.* at 264.) Dr. Nouhi reported that Plaintiff "ambulates currently with a left-handed cane but has significant impairments of activities of daily and social living as well as chronic pain issues . . . ." (*Id.*) Dr. Nouhi also detailed the following limitations: "She currently has limitations on activities that require any pushing or pulling. She is unable to carry any items more than 10 pounds. She is unable to climb stairs,

work in unprotected heights, perform any activity that requires any bending, stooping, kneeling, or crawling." (*Id.*)

On December 16, 2003, Dr. Alan Ketelhohn, an orthopedist, completed a Residual Functional Capacity ("RFC") assessment based solely on Plaintiff's medical records. (*See id.* at 105.) Dr. Ketelhohn expressed doubt regarding Plaintiff's claims that she could only stand or walk ten minutes and sit twenty to thirty minutes at a time. (*See id.* at 110.) He based this sentiment on the fact that Plaintiff displayed "good strength [and] no deficits or muscle weakness." (*Id.*) He also noted that Plaintiff's "pain is not fully supported by fair gait, good strength and mild [defects] on knee X-ray." (*Id.*) Dr. Ketelhohn interpreted the medical reports and determined that Plaintiff could: (1) lift twenty pounds occasionally; (2) lift ten pounds frequently; (3) sit about six hours in an eight-hour workday; and (4) could engage in unlimited pushing and/or pulling (including operation of hand and/or foot controls). (*See id.* at 106.) Dr. Ketelhohn also concluded that Plaintiff could occasionally climb ramps or stairs, balance, kneel, crouch, and crawl. (*See id.* at 107.) According to Dr. Ketelhohn's assessment, Plaintiff could also stoop frequently. (*See id.*)

Dr. Ketelhohn acknowledged that his assessment is at odds with, and in fact differs significantly from, the assessments of Plaintiff's treating and examining doctors. (*See id.* at 111.) Dr. Ketelhohn defended his position by stating that the limitations in place from treating physicians "are not supported by poor gait [with] cane in opposite hand which is not most helpful for knee" and that their ten pound limitation "is not consistent with 5/5 strength . . . ."

(*See id.*)  He also cross-referenced an earlier statement calling into question Plaintiff's pain and finally concluded that the previous opinions of Plaintiff's doctors "carry no weight."  (*See id.*)

On September 19, 2005, Plaintiff was examined by Dr. Russell DeGroote of Maple Leaf Orthopaedics.  (*Id.* at 274.)  Plaintiff reported constant sharp, stabbing pain.  (*Id.*)  Dr. DeGroote found no atrophy, ecchymosis, or swelling.  (*Id.*)  He also found Plaintiff's strength, gait, and reflexes to be normal.  (*Id.*)  Dr. DeGroote found mild varus deformity (turning inward), mild crepitus (grinding), and mild to marked tenderness in places in and around the right knee.  (*Id.*)  He also found evidence of osteoarthritis in the right knee.  (*Id.*)  Dr. DeGroote ordered an MRI of Plaintiff's right knee.  (*See id.* 272–73.)  The MRI revealed mild effusion, degenerative changes in Plaintiff's knee, some extrusion of the medial meniscus, and a possible chronic or partial tear of her anterior cruciate ligament (ACL).  (*Id.* at 271–73.)  On August 7, 2005, at Plaintiff's next appointment with Dr. DeGroote, she displayed "definite improvement."  (*See id.* at 271.)  She next saw Dr. DeGroote following a visit to the emergency room resulting from a fall apparently caused by a greeter at Wal-Mart.  (*See id.* at 286–88.)  Plaintiff reported severe pain in her right knee and Dr. DeGroote again noted degenerative changes to her right knee as well as possible tears to her meniscus.  (*See id.* at 286.)

Plaintiff was most recently examined by family practice physician, Dr. David Walters.  (*See id.* at 282–85.)  Dr. Walters's professional relationship with Plaintiff is unclear from the record, mostly because the record is unclear — much of Dr. Walters's records are almost completely illegible.  (*See, e.g.*, *id.* at 277–85.)  Nonetheless, to the extent that it can be deciphered, Dr. Walters's medical assessment form completed in connection with Plaintiff's

disability claim concludes that Plaintiff occasionally could lift or carry items up to ten pounds. (*See id.* at 277–81.)  Dr. Walters also concluded that Plaintiff could, during an eight-hour workday: (1) sit for three hours; (2) stand and walk for an hour; (3) sit for an hour at a time, and (4) stand or walk for less than an hour at a time.  (*See id.* at 278.)  Dr. Walters noted no push/pull restrictions, but determined that Plaintiff should never climb, stoop, crouch, kneel, or crawl. (*See id.* at 278–79.)  In forming his conclusions, Dr. Walters apparently relied heavily on the reports of Dr. Mars, because Dr. Walters repeatedly cited to Dr. Mars when asked for factual support for his conclusions.  (*See id.* at 277–78, 280–81.)  Since his visit logs are illegible, however, the court cannot determine if Dr. Walters had an independent basis for his conclusions.

### 2.      *Procedural History*

On August 22, 2003, Plaintiff protectively filed an application for disability insurance benefits.  (*Id.* at 15, 49–51.)  On December 18, 2003, the Social Security Administration denied Plaintiff's application.  (*Id.* at 45–48.)  On February 9, 2004, Plaintiff requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 44.)  On February 23, 2006, an ALJ held a hearing on the matter.  (*Id.* at 303.)

Plaintiff, represented by counsel, appeared and testified at the ALJ hearing.  (*See id.* at 303.)  A vocational expert ("VE") also testified at the hearing.  (*Id.* at 304.)  Plaintiff testified that, at the time of the hearing, she was fifty-four years old, was married, and lived in a home she owned with her husband.  (*See id.* at 305.)  Her husband worked out of their home and they filed joint tax returns, but Plaintiff could not recall their annual income.  (*See id.* at 306–07.)  Plaintiff testified that she was 5 feet, 4 inches tall and weighed 194 pounds, and that her eyesight was

"okay, but it is not 20/20." (*Id.* at 308.) When questioned further, she noted that her "left eye has been off for a long time," but later admitted that she has "learned how to deal with [it]." (*Id.* at 308, 325.)

Plaintiff testified that she stopped working in August 2002. (*See id.* at 309–10.) According to Plaintiff, she quit her job because she believed that if she did not, her boss would have fired her. (*See id.* at 310.) She admitted that if she had not quit, she could have continued to work. (*See id.*) However, by November of 2002, she allegedly was physically unable to work. (*See id.* at 311.) Plaintiff also stated that she was not working or looking for employment at the time of the hearing, and that she thought that she could no longer work in her previous positions as a restaurant or retail manager. (*See id.*)

Plaintiff stated at the hearing that her "biggest problem is the pain in [her] leg." (*Id.* at 311.) She claimed that she experienced pain in her knee, lower leg, and thigh every day, but that the severity would intensify at times. (*See id.* at 312.) According to Plaintiff, in order to address the pain she took over-the-counter pain medication a couple of times a week, used a lot of pain rubs, and soaked in hot water frequently. (*See id.*) She also took prescription pain medications on rare occasion, but avoided them because they made her feel "foggy." (*See id.* at 312, 322.)

Plaintiff testifies that the pain made it difficult for her to remain in one position for an extended period of time, thus making any work impossible. (*See id.* at 313.) Additionally, she stated that she fell six times or more each day. (*See id.*) She reported that she constantly uses a cane prescribed by her physical therapist. (*See id.* at 313–14.) Furthermore, she testified that her

doctors have told her that she will eventually need knee replacement, but that she is not yet a good candidate.  (*See id.*)

As for her mobility, Plaintiff testified that she was able to walk for ten minutes at a time. (*See id.* at 314.)  She also reported that she went shopping twice a week for ten or fifteen minutes at a time while holding onto a shopping cart for support.  (*See id.* at 315.)  However, she was unable to carry a bag of groceries or put one in the car.  (*See id.*)  Plaintiff also testified that she exercised for ten or fifteen minutes about twice a week on a stationary bike.  (*See id.* at 316.)

During the ALJ hearing, Plaintiff stated that she could only sit for thirty miniutes before her foot went numb.  (*See id.*)  In response to a question from the ALJ, Plaintiff speculated that she could sit somewhere between two and three-and-one-half hours per day.  (*See id.*)  She also stated that she could stand for ten minutes at a time with a thirty minute break in between.  (*See id.*)  She testified that she had no trouble with her grip and could reach over her head, but could not climb stairs, kneel, stoop, or bend over.  (*See id.* at 316–17.)  Plaintiff also claimed she could lift ten pounds, but could not carry this weight very far because of the pressure on her knee.  (*See id.* at 317.)

Plaintiff testified that she has trouble sleeping — getting only four to six hours a night. (*See id.* at 318.)  She also reported taking five to six rest breaks per day, for thirty to forty minutes each.  (*See id.*)  Plaintiff explained that she needs help getting in and out of the bathtub and with putting on pants and shoes.  (*See id.* at 318.)  She recounted that she is able to do light housework — sweeping, vacuuming, dishes, cooking, and laundry — in brief intervals.  (*See id.* at 318–19.)  However, Plaintiff needed help with many of these chores.  For example, she needs

help carrying laundry to the laundry room and putting it away.  (*See id.* at 319.)  The same is true

with the dishwasher — Plaintiff can load it, but not unload it.  (*See id.*)  She cannot make a bed,

mop, take the trash out, garden, work in the yard, or vacuum large areas.  (*See id.* at 318–19.)

Plaintiff testified that she no longer drives because of the discomfort to her knee.  (*See id.*

at 320.)  She does crochet, watch television, go to lunch with friends, go out to the movies on

occasion, and go to her grandchildren's sporting events.  (*See id.* at 321.)  However, she no

longer runs, hikes, bikes, or plays with her grandchildren as she did in the past.  (*See id.* at 324.)

Following Plaintiff's testimony, the ALJ then posed several hypotheticals to the VE in

order to assess Plaintiff's ability to perform her past work as a fast-food restaurant or retail

manager or other work.  (*See id.* at 326–41.)  For the first hypothetical, the ALJ sought analysis

under Dr. Ketelhohn's assessment of Plaintiff:

> The person here assume [sic] could lift ten pounds frequently, [twenty] pounds
> occasional [sic], stand, sit, walk six of eight hours in a workday.  Push is —
> push/pull is okay, some postural limitations, occasional climbing activities like
> ramps and stairs, no work involving ladders, ropes, scaffolds, occasional balance,
> kneel, crouch, crawl.  The near and far acuity on the vision is — there's some
> limits.  The person — if the job required very keen vision, it would limit it.  The
> person should avoid concentrated exposure to extreme cold and to hazards like
> machinery and heights and the like.

(*Id.* at 326–26A.)  The VE found that Plaintiff could perform her past jobs of fast food manager

and retail manager under such limitations.  (*See id.* at 326A.)  He also found that the retail

manager skills could be transferred to other positions such retail chain store supervisor and

market manager.

The second hypothetical asked, "If we assume that a person with the same abilities and limitations as in the first hypothetical would need a cane for walking and standing, would your answer be different if they had to use a device for stand and walk [sic]?" (*Id.*) The VE responded that he would remove fast food manager from consideration, but retain retail manager. (*See id.*) Plaintiff's attorney later inquired about the impact on hypotheticals one and two if the subject had to alternate between sitting and standing, as needed, throughout the day. (*See id.* at 340.) The VE responded that such an additional limitation to the hypothetical would eliminate all possible work. (*See id.*)

The ALJ's third hypothetical contemplated a scenario in line with Dr. Nouhi's conclusions:

> Assume . . . the following; same vocational profile. This person assume additionally would have limitations on push/pull. It didn't say what. . . . Carry would be limited to no more than ten pounds, unable to climb stairs, work in unprotected heights, unable to perform activities that require bending, stooping, kneeling or crawling.

(*Id.* at 326A–27.) The ALJ clarified that this hypothetical did not include a cane. (*See id.* at 327.) In this scenario as well, the VE removed the possibility of fast food manager, but retained the retail manager position. (*See id.*) The VE also suggested that a person fitting the hypothetical description could work as a small product assembler, charge account clerk, and dispatcher. (*See id.* at 333–34.)

The fourth hypothetical presented to the VE tracked Dr. Walters's conclusions:

> Assume the following, same vocational profile. The person can occasionally lift and carry up to ten pounds. The person can occasionally lift and carry ten pounds. The person could only work the following hours in an eight hour day, sit

three hours, stand one hour and walk one hour. The person could not climb, stoop, crouch, kneel and crawl.

(*Id.* at 334.) The VE noted that this hypothetical removed all of Plaintiff's past relevant work and any other jobs in the market from contention. (*See id.*)

The ALJ's fifth and final hypothetical to the VE was based upon Plaintiff's testimony and other sources:

Let's assume the same vocational profile. The person is limited on walking ten minutes at a time and that would be for short distances only and less than occasionally in a day's work; sit [thirty] minutes at a time, two to three hours in an eight hour day total, could only stand for ten minutes at a time. All standing and walking would require a hand held device. No stair climbing. Overhead reach is intact. No bending, stooping or kneeling, lift ten pounds occasionally and that would have to be table height, not from the ground or floor. And carry would be limited to less than ten pounds occasionally. Her grip is okay.

(*Id.* at 335.) The ALJ added that total standing in a day could not exceed one hour and that thirty minute breaks would have to follow each ten minute period of standing. (*See id.* at 336.) The VE opined that Plaintiff would be precluded from all work by such limitations. (*See id.*) The hearing concluded with a discussion about the transferability of Plaintiff's management experience in which Plaintiff and the VE agreed that her experience as a fast food manager and as a retail manager overlapped and required similar skills. (*See id.* at 336–39.)

On May 31, 2006, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act ("SSA"). (*Id.* at 15–21.) The ALJ concluded that although Plaintiff was severely impaired, she was not prevented from engaging in her past relevant work as a retail or fast-food restaurant manager. (*See id.* at 16.) The ALJ found that, generally speaking, Plaintiff was not "persuasive" or "credible" as a witness. (*See id.* at 17, 21.)

He also concluded that the objective evidence such as Plaintiff's reported daily activity and the test results did not support her claims of pain or restricted movement.  (*See id.* at 17–18.) Furthermore, he found Dr. Ketelhohn's conclusions more persuasive than those of the treating and examining physicians, giving it "great weight."  (*See id.* at 18–19.)  In the end, the ALJ found that Plaintiff had

> the residual functional capacity to perform a range of sedentary and light exertional work, while sitting, standing, or walking for up to six hours in a regular work day; lifting up to ten pounds frequently, and up to twenty pounds occasionally; with no limitations on her ability to engage in push/pull activities; occasionally climbing ramps or stairs; never climbing ladders, ropes, or scaffolds; only occasionally engaging in postural activities of bending, kneeling, crouching, or crawling; while avoiding extremes of cold or exposure to environmental hazards such as moving machinery or heights; and while avoiding work that requires keen vision.

(*See id.* at 18.)

On June 26, 2006, Plaintiff filed an appeal with the Appeals Council.  (*Id.* at 11.)  On May 9, 2007, the Appeals Council denied Plaintiff's request for a review of the ALJ's decision. (*Id.* at 5–7.)  The Appeals Council determination is the Commissioner's final decision on the matter.  *See Hardman v. Barnhart*, 362 F.3d 676, 678 (10th Cir. 2004).  On July 6, 2007, therefore, pursuant to sections 405(g) and 1383(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3) (2006), Plaintiff appealed the Commissioner's decision to this court.  (*See* Complaint [filed July 6, 2007].)  On November 7, 2007, Plaintiff filed her opening brief with the court.  (*See* Opening Br. [filed Nov. 17, 2007].)  On December 7, 2007, the Commissioner responded.  (*See* Def.'s Resp. Br. [filed Dec. 7, 2007].)  On December 21, 2007, Plaintiff replied. (*See* Reply Br. [filed Dec. 21, 2007].)  This matter is fully briefed and ripe for review.

# ANALYSIS

## 1.    *Standard of Review*

Section 405(g) of the Social Security Act establishes the scope of this court's review of

the Commissioner's denial of disability insurance benefits and supplemental security income

benefits.  *See* 42 U.S.C § 1383(c)(3) (2006) (incorporating review provisions of 42 U.S.C. §

405[g]).  Section 405(g) provides, in relevant part, that:

> [t]he findings of the Commissioner of Social Security as to any fact, if supported
> by substantial evidence, shall be conclusive, and where a claim has been denied
> by the Commissioner of Social Security or a decision is rendered under
> subsection (b) of this section which is adverse to an individual who was a party to
> the hearing before the Commissioner of Social Security, because of failure of the
> claimant or such individual to submit proof in conformity with any regulation
> prescribed under subsection (a) of this section, the court shall review only the
> question of conformity with such regulations and the validity of such regulations.

42 U.S.C § 405(g) (2006).  Thus, this court's review is limited to determining whether the record

as a whole contains substantial evidence supporting the Commissioner's decision.  *See id.*;

*Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992).  The

court must uphold the Commissioner's decision if it is supported by substantial evidence.  *See*

*Dollar v. Bowen*, 821 F.2d 530, 532 (10th Cir. 1987).  This court cannot reweigh the evidence

nor substitute its judgment for that of the ALJ.  *Jordan v. Heckler*, 835 F.2d 1314, 1316

(10th Cir. 1987).  That does not mean, however, that my review is merely cursory.  To find that

the ALJ's decision is supported by substantial evidence, the record must include sufficient

relevant evidence that a reasonable person might deem adequate to support the ultimate

conclusion.  *Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987).  A decision is not based on

substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it. *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985). The ALJ's decision is also subject to reversal for application of the wrong legal standard. *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Frey*, 816 F.2d at 512.

## 2.      *Evaluation of Disability*

The qualifications for disability insurance benefits under the SSA are that the claimant meet the insured status requirements, be less than sixty-five years of age, and be under a "disability." *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991). The SSA defines a disability as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A) (2006). In proving disability, a claimant must make a *prima facie* showing that he is unable to return to the prior work he has performed. *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988). Once the claimant meets that burden, the Commissioner must show that the claimant can do other work activities and that the national economy provides a significant number of jobs the claimant could perform. *Frey*, 816 F.2d at 512.

The Commissioner has established a five-step process to determine whether a claimant qualifies for disability insurance benefits. *See* 20 C.F.R. § 404.1520 (2008); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987) (describing the five-step analysis). A claimant may be declared disabled or not disabled at any step; and, upon such a determination, the subsequent steps may be disregarded. *See* 20 C.F.R. § 404.1520(a) (2008); *Williams v. Bowen*, 844 F.2d 748, 750 (10th

Cir. 1988). First, the claimant must demonstrate that she is not currently involved in any substantial gainful activity. 20 C.F.R. § 404.1520(b) (2008). Second, the claimant must show a medically severe impairment (or combination of impairments) which limits his physical or mental ability to do basic work activities. *Id.* § 404.1520(c). At the third step, if the impairment matches or is equivalent to established listings, then the claimant is judged conclusively disabled. *Id.* § 404.1520(d). If the claimant's impairments are not equivalent to the listings, the analysis proceeds to the fourth step. At this stage, the claimant must show that the impairment prevents him from performing work he has performed in the past. *See Williams*, 844 F.2d at 751 (citations omitted). If the claimant is able to perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(f) (2008); *Williams*, 844 F.2d at 751. The fifth step requires the Commissioner to demonstrate that: (1) the claimant has the RFC to perform other work based on the claimant's age, education, past work experience; and (2) there is availability of that type of work in the national economy. *See* 20 C.F.R. § 404.1520(g) (2008); *Williams*, 844 F.2d at 751.

### 3.    *Disability Determination*

As mentioned above, following the ALJ hearing, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act. More specifically, the ALJ found that Plaintiff's disability claim survived the first three steps of the disability analysis: (1) she was not engaged in substantial gainful activity; (2) she was suffering from a severe impairment; and (3) her impairment did not meet or equal the criteria of any of the listed impairments. (Admin. R. at 16.) However, the ALJ found that Plaintiff had failed to prove that she was prevented from

performing her past relevant work and thus failed step four. (*See id.* at 20.) The ALJ outlined

his conclusions as follows:

1.      [Plaintiff] met the disability insured status requirements of the Act on August 20, 2002, the date she alleges that she became unable to work, and she will continue to meet them through at least December 31, 2007.

2.      [Plaintiff] has not engaged in substantial gainful activity since August 20, 2002.

3.      The medical evidence establishes that [Plaintiff] has osteoarthritis of the right knee, which constitutes a severe impairment; but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4.      [Plaintiff's] testimony was not credible regarding her symptomatology and resulting limitations (20 C.F.R. § 404.1529; and [Social Security Ruling] 96-7p[, 1996 WL 374186]).

5.      [Plaintiff] has the residual functional capacity to perform a range of sedentary and light exertional work, while sitting, standing, or walking for up to six hours in a regular eight hour work day; lifting up to ten pounds frequently, and up to twenty pounds occasionally; with no limitations on her ability to engage in push/pull activities; occasionally climbing ramps or stairs; never climbing ladders, ropes, or scaffolds; only occasionally engaging in postural activities of bending, kneeling, crouching, or crawling; while avoiding extremes of cold or exposure to environmental hazards such as moving machinery or heights; and while avoiding work that requires keen vision (20 C.F.R. § 404.1545).

6.      [Plaintiff's] past relevant work, as a fast food manager and retail manager, did not require the performance of work-related activities precluded by the aforementioned residual functional capacity (Vocational Expert Testimony and 20 C.F.R. § 404.1560).

7.      [Plaintiff] is not prevented from performing her past relevant work as a fast food manager and retail manager.

8.      [Plaintiff] has not been under a disability as defined in the Social Security Act and Regulations at any time since August 20, 2002, and continuing through the date of this decision (20 C.F.R. § 404.1520[e]).

(*Id.* at 20–21.)

        In appealing the ALJ's decision, Plaintiff raises seven objections to the ALJ's

determination that she is not disabled:

1.    The ALJ erred by failing to consider all the medical and other evidence in the case, including, but not limited to, the testimony of Marti Rauer, the Vocational Expert.

2.    The ALJ erred by selectively and/or erroneously citing medical evidence.

3.    The ALJ erred in failing to give appropriate weight to the opinion of treating physician Dr. Walters.

4.    The ALJ erred in failing . . . to consider a letter from Karen Wilson in accordance with 20 C.F.R. § 404.1529(C)(3).

5.    The ALJ erred in failing to postulate a complete hypothetical to the vocational expert.

6.    The ALJ erred in failing to properly evaluate [Plaintiff's] credibility and complaints of pain and has failed to affirmatively link to substantial evidence for his reasons for rejecting the testimony.

7.    The ALJ erred in his conclusion that the impairment was not stopping the Claimant from performing her past relevant work as fast food manager or retail manager.

(Opening Br. at 2.)  I address each of these arguments in turn below.

### a.    *Failing to Consider All the Medical and Other Evidence in the Case*

In the section of Plaintiff's brief that corresponds with her first argument, she asserts that the ALJ, in arriving at his decision, failed to properly consider the testimony of the VE.  (*See id.* at 6.)  The ALJ concluded that "[Plaintiff's] past relevant work, as a fast food manager and retail manager, did not require the performance of work-related activities precluded by the aforementioned residual functional capacity."  (Admin. R. at 21.)  Plaintiff, however, cites passages from the ALJ hearing in which the VE stated that Plaintiff could not work as a fast food manager or retail manager.  (*See id.*)  In failing to give context to these statements, Plaintiff mischaracterizes their relevance.  While it is true that in responding to the five hypotheticals posed by the ALJ, the VE at times found that the positions of fast food manager, retail manager — and for that matter, any work at all — would be precluded.  (*See, e.g.*, *id.* at 326A, 327,

335–36, 340–41.)  However, Plaintiff fails to reveal that these conclusions followed

hypotheticals that the ALJ did not determine to be operative in his decision.  (*See id.* at 21.)

The ALJ's determination that Plaintiff is still able to work as a fast food manager or a

retail manager is supported by the VE's response to hypothetical one.  (*See id.* at 326A.)

Hypothetical one was based on the conclusions of Dr. Ketelhohn, which the ALJ essentially

adopted.  (*See id.* at 21, 106–11, 326–26A.)  Therefore, the ALJ's decision not to incorporate

certain of the VE's conclusions does not, by itself, demonstrate error, and to the extent that the

ALJ's conclusions regarding Plaintiff's RFC were proper, his subsequent finding that Plaintiff

could perform her past relevant work, is supported by substantial evidence.

### b.        *Selectively and/or Erroneously Citing Medical Evidence*

Plaintiff claims that the ALJ impermissibly picked and chose evidence, quoting select

portions of medical records that support his position while "totally disregarding" the medical

evidence that was contrary.  (Opening Br. at 6.)  An ALJ must consider all of the evidence; he

may not pick and choose the evidence from the record that best supports his decision while

ignoring the rest.  *Carpenter v. Astrue*, 537 F.3d 1264, 1265 (10th Cir. 2008).  In other words,

"in addition to discussing the evidence supporting his decision, the ALJ also must discuss the

uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence

he rejects."  *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).  However, a delicate balance

exists for at the same time, the ALJ need not discuss every piece of evidence.  *See id.* at

1009–10.

The ALJ in this case, in arriving at his step-three conclusion that Plaintiff was severely disabled, noted that her doctors diagnosed her with osteoarthritis and derangement of the medial meniscus in her right knee.  (*See* Admin. R. at 16.)  The ALJ also noted that "[i]maging indicated a medial meniscus tear, and degenerative changes . . . ."  (*Id.*)  Within his analysis under step four, the ALJ cited imaging results indicating moderately severe osteoarthritic changes, degenerative changes in Plaintiff's right knee, and a possible torn ACL.  (*See id.* at 17.)  The ALJ also noted that Dr. DeGroote found mild varus deformity, mild crepitus and effusion, and marked tenderness in Plaintiff's right knee.  (*Id.*)  The ALJ cited Dr. Mars's determination as part of his Maximum Medical Improvement assessment that Plaintiff exhibited a ten percent whole person impairment and limited flexion.  (*See id.* at 19.)  Lastly, he noted Dr. Nouhi's finding that Plaintiff has reduced strength in her right knee.  (*Id.*)

The ALJ juxtaposed these findings against additional contrary statements from these doctors and others.  For example, he noted that imaging results did not indicate any significant damage to the knee that would comport with Plaintiff's claims of instability.  (*Id.*)  He also noted her doctors' findings of no acute derangement of the knee and their reports that, at times, Plaintiff exhibited no swelling or atrophy, no instability, no tenderness, no neurovascular problems, normal muscle strength, intact sensations, normal gait and station, and full extension of the right knee.  (*Id.* at 17, 19.)

Therefore, the ALJ was faced with an array of evidence that both supported and undermined Plaintiff's position that she was so impaired that she could no longer work.  While the ALJ admittedly did not discuss every medical statement in the record, as Plaintiff points out,

(*see* Opening Br. at 7–8), that is not his charge. *See Clifton*, 79 F.3d at 1009–10. I find that a

reasonable person could deem this evidence adequate to support the ALJ's ultimate conclusion

that Plaintiff was severely impaired, yet not to the point of being unable to perform her previous

work as a fast food manager or a retail manager. Thus, there is substantial evidence supporting

the ALJ's conclusion. *See Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987). Only through the

impermissible exercise of reweighing the evidence before the ALJ, could I come to a different

result. *See Jordan v. Heckler*, 835 F.2d 1314, 1316 (10th Cir. 1987).

### c. Failing to Give Appropriate Weight to the Opinion of Treating Physician Dr. Walters

Dr. David Walters is a family practice physician with whom, according to the record,

Plaintiff had two appointments before the doctor filled out a medical assessment in connection

with Plaintiff's disability claim. (*See* Admin. R. at 285.) Within his assessment of Plaintiff, Dr.

Walters suggested various restrictions on work activity that the ALJ ultimately did not adopt.

(*See id.* at 21, 277–85.) Plaintiff argues that the ALJ improperly gave Dr. Walters's opinion

little weight in the analysis of the severity of Plaintiff's condition. (*See* Opening Br. at 9.)

As a general rule, an ALJ must provide within his or her decision, "good reasons" for the

amount of weight attributed to a specific treating physician's opinion. *Watkins v. Barnhart*, 350

F.3d 1297, 1300 (10th Cir.2003) (citing 20 C.F.R. § 404.1527[d][2]; Social Security Ruling

96-2p, 1996 WL 374188, at *5; *Doyal v. Barnhart*, 331 F.3d 758, 762 [10th Cir.2003]).

Opinions for treating sources typically are entitled to greater weight, and sometimes deserve

controlling weight. *Id.*

In summarizing the process of evaluating how much weight to give a treating physician, the Tenth Circuit in *Watkins* described the process as sequential. *Id.* First, the ALJ must ask "whether the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques.'" *Id.* (citing SSR 96-2p, 1996 WL 374188, at *2). If it is, then the ALJ "must then confirm that the opinion is consistent with other substantial evidence in the record." *Id.* If the answer to either one of these questions is no, then the physician's opinion is not to be given controlling weight. *Id.*

Where asked for facts supporting his assessment of Plaintiff, Dr. Walters cited to a report by Dr. Peter Mars.[2] (*See* Admin. R. at 277–78, 280–81.) Because of this fact, the ALJ analyzed the opinions of the two doctors simultaneously. (*See id.* at 19.) The ALJ discussed the fact that Dr. Mars's examination revealed few actual problems with Plaintiff's knee, a fact which was corroborated by imaging results and the reports of other treating and examining physicians. (*Id.*) Ultimately, the ALJ found that "the assessment of these two physicians is neither consistent with nor well supported by the evidence of record, and is thus was not given controlling weight." (*Id.*) However, this does not mean that the opinion is to be disregarded altogether. *See Watkins*, 350 F.3d at 1300 (noting that "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and

---

[2] As mentioned above, the key records from Dr. Walters, are not legible, so the court cannot know for certain whether Dr. Walters had an independent basis for his assertions. (*See* Admin. R. at 285.) However, the legible parts of Dr. Walters's medical assessment refers to no such basis, and neither does Plaintiff.

416.927"). The *Watkins* court listed the factors that guide an ALJ in determining how much weight to give a non-controlling opinion from a treating physician:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Id.* at 1300–01 (citation omitted).

In explaining his decision to give little weight to the opinions of Dr. Walters, the ALJ explained that Dr. Mars "oversaw [Plaintiff's] claim through the Workers Compensation program." (*Id.*) The ALJ also described in detail Drs. Mars's and Walters's assessments of Plaintiff. (*Id.*) The ALJ then compared these assessments to the "objective medical evidence" and Plaintiff's testimony and found them to be inconsistent. (*Id.*) As part of this analysis, the ALJ discussed the results of Dr. Mars's own examination as well as those of other treating and examining physicians that he previously discussed, such as Dr. Nouhi. (*Id.*) The ALJ also made reference to other parts of the record including Plaintiff's testimony regarding her activity, use of pain medication, and statement that at one time she believed that she could have continued in a job requiring considerable standing and walking. (*Id.*)

Based on these recitations in the ALJ's decision, I find that he addressed the first, second, third, fourth, and sixth *Watkins* factors. However, although apparently aware of the fact that Dr. Walters is a family practice doctor, (*see id.* at 334 [stating as much during the ALJ hearing]), the ALJ did not mention this in his written decision, (*see id.* at 19.) The Commissioner argues that

this error is most likely rooted in the fact that the ALJ analyzed Dr. Walters's opinions together

Dr. Mars's since the former depended so heavily on the latter. (*See* Def.'s Resp. Br. at 18.)

More importantly, the absence of this fact has no impact on the analysis. The fifth factor asks

whether the treating "physician is a specialist in the area upon which an opinion is rendered"

suggesting that specialists deserve greater consideration. *See Watkins*, 350 F.3d at 1300. Since

Dr. Walters was not a specialist, this factor would not have militated in favor of granting his

opinion greater weight. Therefore, the lack of a direct statement describing Dr. Walters's status

as a family practice doctor does not undermine the ALJ's analysis regarding how much weight to

give to Dr. Walters's opinion and therefore does not warrant reversal of the ALJ. *See Sherman*

*v. Barnhart*, 192 F. App'x 801, 804 (10th Cir. 2006) (excusing ALJ's failure to consider the fifth

*Watkins* factor where is was not relevant to the weighing analysis); *Fischer-Ross v. Barhhart*,

431 F.3d 729, 733 (10th Cir. 2005) ("[H]armless error analysis 'nevertheless may be appropriate

to supply a missing dispositive finding . . . where, based on material the ALJ did at least consider

(just not properly), we could confidently say that no reasonable administrative factfinder,

following the correct analysis, could have resolved the factual matter in any other way.'"

[quoting *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir.2004)]); *see also Fischer-Ross*, 431

F.3d at 730 (expressing distaste for "unwarranted remands needlessly prolonging administrative

proceedings").

### d. Failing to Consider a Letter from Karen Wilson in Accordance with 20 C.F.R. § 404.1529(C)(3)

Plaintiff argues that the ALJ erred because his opinion did not specifically address a letter that Plaintiff's friend, Karen Wilson, submitted on Plaintiff's behalf. (*See* Opening Br. at 12.) The letter corroborated Plaintiff's claims that she had difficulty perambulating, fell frequently, and lived a much more restricted life than she had before. (*See generally* Admin. R. at 103–04.) According to Plaintiff, the ALJ's failure to discuss the letter in his opinion violated section 404.1529(C)(3) of the Social Security Administration's regulations. (*See id.*) I disagree. Precedent in this Circuit is clear; although "[t]he record must demonstrate that the ALJ considered all of the evidence, . . . an ALJ is not required to discuss every piece of evidence." *Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir. 1996). Instead, "the ALJ . . . must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Id.* at 1010. Ms. Wilson's letter is not uncontroverted or significantly probative. As a result, the ALJ had no obligation to specifically discuss the letter in his opinion.

### e. Failing to Postulate a Complete Hypothetical to the Vocational Expert

Plaintiff argues that the ALJ failed to account for her vision impairment when posing hypotheticals to the VE. (*See* Opening Br. at 12.) The ALJ, when posing the first hypothetical — which he ultimately adopted — to the VE, noted that "the near and far acuity on the vision is — there's some limits. . . . [I]f the job required very keen vision it would limit it." (Admin. R. at 326.)

According to Plaintiff, this was an insufficient limitation because vision in her left eye, with correction, is only 20/200, effectively making her monocular. (*See* Opening Br. at 12.) It is peculiar that Plaintiff raises this issue now, because when questioned about her vision by the ALJ and her attorney during the hearing, Plaintiff explained that she had lived with the condition for a "long time," and further described how it had not limited her in her life. As Plaintiff stated "[n]ever having had [depth perception due to the deficiency in one eye], I don't really understand what I'm missing." (*Id.* at 308, 325); *cf. Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th Cir. 1997) (stating that under step two of the analysis, a claimant "must show more than the mere presence of a condition or ailment"); *Dixon v. Sullivan*, 905 F.2d 237, 238 (8th Cir. 1990) (stating that where claimant "worked with his impairments over a period of years without any worsening of his condition . . . he cannot claim them as disabling"). Furthermore, most of Plaintiff's treating or examining doctors made no note of her impaired eyesight in assessing her work limitations and none of them suggested that it would impair her ability to work. (*See* Admin. R. at 220–21, 262, 264, 279). Therefore, I find the ALJ's limitation regarding Plaintiff's vision is substantially supported by evidence in the record.

> **f.** **Failing to Properly Evaluate Plaintiff's Credibility and Complaints of Pain and Failing to Affirmatively Link to Substantial Evidence for His Reasons for Rejecting the Testimony.**

"Pain can be a disabling condition under Title II of the Social Security Act." *Huston v. Bowen*, 838 F.2d 1125, 1129 (10th Cir. 1988). This assertion is based on the text of the of the Act:

An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability. Objective medical evidence of pain or other symptoms established by medically acceptable clinical or laboratory techniques (for example, deteriorating nerve or muscle tissue) must be considered in reaching a conclusion as to whether the individual is under a disability.

42 U.S.C. § 423 (d)(5)(A) (2006). The Tenth Circuit has explained that "the relationship between the impairment and the alleged pain need only be a loose one and that 'if an impairment is reasonably expected to produce *some* pain, allegations of *disabling* pain emanating from that impairment are sufficiently consistent to require consideration of all relevant evidence.'" *Huston*, 838 F.2d at 1129 (quoting *Luna v. Bowen*, 834 F.2d 161, 164 [10th Cir. 1987] [emphasis in original]).

In interpreting a claimant's pain, the Tenth Circuit has instructed ALJs to make the following inquiry: (1) whether the claimant established a pain-producing impairment by objective medical evidence; (2) if so, whether there is a "loose nexus" between the proven impairment and the claimant's subjective allegations of pain; and (3) if so, whether, considering all the evidence, both objective and subjective, claimant's pain is in fact disabling. *Branum v. Barnhart*, 385 F.3d 1268 (10th Cir. 2004) (citing *Luna*, 834 F.2d 161). If the medical evidence establishes a pain producing ailment that has a loose nexus with the claimant's subjective

complaints about pain, then the ALJ is to determine the credibility regarding those complaints. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir.1995).

"Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence." *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005) (citation omitted). However, a court is to keep in mind that "[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Huston*, 838 F.2d at 1133.

Plaintiff argues that the ALJ failed to consider "all of the relevant medical and objective evidence" in evaluating the impact of her pain o her ability to work. (*See* Opening Br. at 12.) In his decision, the ALJ first recounted Plaintiff's testimony about her daily activities and the limitations she faces. (*See* Admin. R. at 17.) He then stated that he "carefully considered the effects of the claimant's alleged pain in accordance with the criteria set forth in the regulations" and listed the various considerations he employed. (*Id.* at 17 [citing 20 C.F.R. § 404.1529].) The ALJ then concluded that Plaintiff was not "a persuasive witness." *Id.* He then proceeded to detail the medical evidence which supported his position that the "objective findings are simply not supportive of [Plaintiff's] allegation of such severe limitations in her ability to sit, stand, and walk." (*Id.* at 17–18.)

The ALJ also detailed further why he thought Plaintiff was not a credible witness: (1) the fact that she rarely used pain medication; (2) she remained quite active, continuing to shop, go to the movies and out to dinner, attend her grandchildren's sporting events, and perform some household chores; (3) she was not forthcoming regarding her husband's income; (4) she testified

that she quit her job at McDonald's because of an altercation with her boss, not the alleged disability; and (5) no doctor had prescribed the cane that she insisted she relied upon. (*See id.* at 18.) Finally, the ALJ concluded that "[c]onsidering the inconsistencies between her allegations and her activities, the lack of objective medical support, and the claimant's rather infrequent use of even over the counter pain medication, her complaints are not found to be fully persuasive, and thus the undersigned is unable to find that she has pain and other symptoms of the frequency, intensity, or persistence alleged." (*Id.*)

With respect to the three-step analysis first detailed by the Tenth Circuit in *Luna*, the ALJ assumed the first two steps and focused on the third — whether, considering all the evidence, both objective and subjective, Plaintiff's pain is in fact disabling. (*See id.* at 17–19); *cf. Qualls v. Apfel*, 206 F.3d 1368 (10th Cir. 2000) (explaining that ALJ need not partake in a formalistic analysis of a claimants credibility, just present the specific evidence on which he relied). Plaintiff does not alert the court to exactly which evidence she feels the ALJ should have considered. (*See* Opening Br. at 12.) The ALJ stated that Plaintiff alleged "rather extreme symptoms and limitations, including the somewhat incredible allegation that she falls six times a day." (Admin. R. at 17.) He then discusses various imaging results of her knee, the statements of several of Plaintiff's treating physicians, and Plaintiff's testimony. (*See id.* at 17–18.) While the ALJ does specifically address all of the evidence, there is no indication that he purposefully excluded all contrary evidence in favor of supportive evidence. Because the inquiry here is whether there is substantial evidence supporting the ALJ's conclusions, I find that there are no grounds for reversing the ALJ based on his analysis of Plaintiff's pain.

### g. *Conclusion That the Impairment Was Not Stopping Plaintiff from Performing Her Past Relevant Work as Fast Food Manager or Retail Manager*

Although Plaintiff asserts this as a separate argument in her introduction, (*see* Opening Br. at 2), she does not do so in the body of her brief. Since this ground for overturning the ALJ's decision is essentially a repetition of her second argument, I need not address it anew.

### 4. *Conclusion*

Upon review of Plaintiff's arguments on appeal of the ALJ's decision, I find that the ALJ's determinations are each supported by substantial evidence. Based on the foregoing, it is therefore ORDERED that the Commissioner's decision is AFFIRMED.

Dated this 30th day of September, 2008.

BY THE COURT:

s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
Chief United States District Judge